RECEIVED

2010 JAN 19 P 2 38

CLERK
U S BKRUPTCY
[illegible] NA

**ANDREW C. BAILEY**
2500 N. Page Springs Rd
Cornville, AZ 86325
928 634-4335
*Self-Represented Litigant*

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **ANDREW C. BAILEY**<br>Plaintiff<br><br>vs<br><br>WELLS FARGO BANK NA a/k/a WELLS FARGO HOME MORTGAGE (WELLS FARGO)<br><br>JOHN DOES "2001-3000"<br><br>Defendants | **Chapter 11**<br>**BK Case #: 2:09-bk-06979-PHX-RTBP**<br>**AP Case #: 2:09-ap-01729-RTBP**<br><br>**AMENDED COMPLAINT FOR ENFORCEMENT OF QUALIFIED WRITTEN REQUEST AND TEMPORARY RESTRAINING ORDER**<br><br>Related to<br>Subject property:<br>2620 N. Page Springs Rd,<br>Cornville, AZ 86325<br>Wells Fargo Account<br>#: 6506500097105001 |

Plaintiff sues Defendants to compel discovery pursuant to F.R.B.P 7001(2) and 7001(9), to answer the Qualified Written Request pursuant to the Real Estate Settlement Procedures Act 12 U.S.C. § 2605 and Debt Validation Letter pursuant to the Fair Debt Collection Practices Act 15 U.S.C §1692, and to stay any foreclosure or other action before and until the resolution of this complaint, and states:

## I. Jurisdiction, Venue and Statutory Predicate

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicate for the relief requested herein is Federal Rule of Bankruptcy Procedure 7001(2) to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d), and Federal Rule of Bankruptcy Procedure 7001(9) to obtain a declaratory judgment relating to the foregoing. Other Rules and Statutes apply, including but not limited to 12 U.S.C. § 2605 and 15 U.S.C §1692.

## II. Parties Known and Unknown

3. There may be multiple known and unknown stakeholders with potential claims relating to the subject Property and "mortgage loan " (hereafter the Transaction). Plaintiff seeks discovery as to exactly who these stakeholders and other parties are, what their respective rights are under the law, and how much, if anything, he owes each of them.

4. Plaintiff is a resident of the State of Arizona who owns and uses his property located at 2620 North Page Springs Rd, Cornville, AZ 86325 (hereafter the "Property")

5. Defendant WELLS FARGO is and was, at all times material hereto, a corporation doing business in the State of Arizona. Defendant WELLS FARGO is and was, at all times material

hereto, the alleged "originator" and "servicer" of the subject loan.

6. The above named and identified Defendant may not be a creditor in the Transaction. Defendants JOHN DOES "2001-3000" include the creditors in the Transaction and are undisclosed, unnamed and unknown investors, participants, corporate or other entities, conduits, trustees, servicers, custodians and others in a commonly-applied mortgage securitization scheme that may or may not have included the Transaction and who may or may not be investors or certificateholders in an unidentified Wall Street trust or other entity, such entity acting as or selling a mortgage-backed investment vehicle or vehicles which may or may not be secured in whole or in part by the Transaction.

7. In addition to Plaintiff's Chapter 11 case (2:09-bk-06979-PHX-RTBP) there are three (3) companion cases to the instant action, each with a similar but distinct group of "JOHN DOES", to wit:

2:09–ap–01731–RTBP (JOHN DOES 1-1000), and

2:09–ap–01728–RTBP (JOHN DOES 1001-2000), and

2:09–ap–01727–RTBP (JOHN DOES 3001-4000).

**III. Background Material Facts and Grounds for Complaint**

Plaintiff reaffirms and realleges paragraphs 1 through 7 hereinabove as if set forth more fully hereinbelow.

8. On April 8th, 2009 three of Plaintiff's unsecured creditors filed an involuntary petition against the Plaintiff for relief under Chapter 7 of title 11 of the United States Code (the

"Bankruptcy Code").

9. On May 28th, 2009 (the "Petition Date"), this Court entered an order granting Plaintiff's motion to convert to Chapter11 thereby commencing the above-captioned case.

10. Plaintiff is operating his businesses and managing his properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11. Plaintiff has subsequently filed and revised all schedules and other necessary documents, and has satisfied all of the requirements of the Bankruptcy Court and the US Trustee in the case to date.

12. The United States Trustee's office conducted the initial creditors' meeting pursuant to 11 U.S.C. § 341 on September 4, 2009.

13. The Transaction is Plaintiff's purchase of a financial product or security as set forth and illustrated by Composite Exhibit "A" (Deed of Trust and Note).

14. Plaintiff has secured the services of a mortgage audit firm which has performed a forensic review of the Transaction with the goal of determining who Plaintiff's creditors are, and how much is owed to them.

15. Plaintiff has initiated forensic reviews of his alleged mortgage-related obligations with the goal of determining who his creditors are, and how much is owed to them.

16. On September 21, 2009, Plaintiff served a Qualified Written Request pursuant to the Real Estate Settlement Procedures Act 12 U.S.C. § 2605 and Debt Validation Letter pursuant to the Fair Debt Collection Practices Act 15 U.S.C §1692 on Defendant WELLS FARGO through their attorneys of record, in a diligent attempt to clarify the above issues.

17. Defendant WELLS FARGO through counsel refused in writing to comply with the RESPA and FDCPA requests. No response other than the letter of refusal has been received as of the date of the Complaint. A Certificate of Non-Response and a Certificate of Dishonor are being filed with the appropriate authorities.

18. Defendant WELLS FARGO has instituted a foreclosure proceeding to foreclose on a mortgage as to the Property.

19. Plaintiff has secured the services of an expert in securitized residential mortgage products and mortgage-backed securities as set forth in Exhibit "B".

20. Plaintiff's expert witness has executed a Declaration of his findings, opinions and recommendations as set forth in Exhibit "C".

21. Based on the above, Plaintiff has received conflicting representations as to the alleged creditor's identity, and now believes a title defect or cloud on title exists thus rendering title to the Property in the Transaction unmarketable.

22. Plaintiff seeks relevant information that has been denied to him. This information includes but is not limited to answers to questions of whether the subject loan was

securitized, sold, assigned or re-conveyed, the identity of the creditor who funded the Transaction, and whether any credit-default insurance or any TARP or other "bailout" money has changed hands relative to the subject loan.

23. Defendant WELLS FARGO has taken the position that an alleged photocopy of the original unassigned and unendorsed December 23, 2005 note is sufficient foundation for Defendant WELLS FARGO'S November 6, 2009 foreclosure action.

24. No Assignment, endorsed instrument or enforceable Note has been produced to the Plaintiff or the Court, and as such Defendant WELLS FARGO has thus far failed to prove that it is the holder of all rights under the Note, which would permit the legal holder thereof to declare a default which would trigger a foreclosure.

25. Further, Defendant WELLS FARGO as alleged or implied "trustee-in-fact" or "attorney-in-fact" for unnamed 'Certificateholders' of a series of mortgage-backed securities, has failed to demonstrate that it, and not the Certificateholders, is the party with the true ownership interest in the Mortgage the subject of this action, or that the Certificateholders have acceded or legally assigned their rights to and under the subject Mortgage to Defendant WELLS FARGO, specifically the right to seek a foreclosure.

26. As such, Defendant WELLS FARGO has not demonstrated that it has suffered an actual or threatened injury as a consequence of any default, which distinct and palpable injury is legally required under applicable Federal and State law in order for Defendant WELLS FARGO to satisfy the legal prerequisite to prove that it has a sufficient personal stake in and legal standing to institute the foreclosure on the Property.

27. As a severance of the ownership and possession of the original Note and Mortgage may have occurred and if so the true owner and holder of both the original Note and Mortgage being unknown as a result of one or more alleged assignments and the parsed sale of certain rights under the Note, Defendant WELLS FARGO is legally precluded from foreclosing on the Property unless and until it can demonstrate full legal standing to do so.

28. As set forth above, Defendant WELLS FARGO is only the alleged "originator" and "servicer" of the Note, having never funded the Transaction and as such cannot institute or maintain a foreclosure proceeding.

29. Plaintiff served his First Set of Interrogatories and First Request to Produce Documents on Defendants on January 11, 2010 as set forth in Exhibit "D".

30. This Complaint is being timely filed in accordance with applicable law to challenge the foreclosure prior to any Trustee Sale or the issuance of any Certificate of Title following sale.

**IV. RELIEF SOUGHT**

Plaintiff reaffirms and realleges paragraphs 1 through 30 hereinabove as if set forth more fully hereinbelow.

31. Plaintiff requests a hearing on the merits, based on the rules of evidence and founded on common discovery and enforcement in obtaining relevant information about his loan.

32. Plaintiff requests discovery pursuant to Bankruptcy Rules 7026 through 7037 and F.R.C.P 26 through 37 including but not limited to enforcement of the Real Estate Settlement Procedures Act Qualified Written Request and the Fair Debt Collection Practices Act Debt Validation Letter to test the merits of Defendant WELLS FARGO 'S allegation that they have the right to enforce the note.

33. Plaintiff seeks a complete accounting from those individuals, entities or parties involved in the origination, servicing, and securitization of his loan, so that he can discover what undisclosed fees were paid under TILA and RESPA, and the true identities of the people involved in Plaintiff's table-funded loan.

34. Plaintiff seeks the disclosure of the identity(ies) of the creditor(s) who actually funded the Transaction, and the production of documents and names, addresses and phone numbers of people who can testify under oath at the evidentiary hearing.

35. Plaintiff requests the opportunity to admit evidence, including but not limited to the results of a forensic analysis of the Transaction and documents on record at the Yavapai County Recorder's office.

36. Plaintiff requests the opportunity to present expert witness Neil F. Garfield, MBA, JD or another expert witness at the evidentiary hearing.

37. Plaintiff requests that the Court give serious consideration to Dr. Garfield's expert opinions and testimony as they may apply to Plaintiff's situation and to the situation of millions of other property owners facing foreclosure.

38. Plaintiff requests a declaratory judgment relating to the foregoing.

39. Finally, Plaintiff requests that the court grant a temporary restraining order enjoining Defendants from taking any further foreclosure or other judicial or non-judicial action before the resolution of the foregoing, thereby maintaining the status quo at least until discovery has been conducted.

WHEREFORE, Plaintiff respectfully requests that the Court order and grant (a) an evidentiary hearing on the merits, and (b) discovery and enforcement in obtaining all relevant information, and (c) enforcement of the disclosure requirements and default clauses of the Real Estate Settlement Procedures Act and the Fair Debt Collection Practices Act, and (d) the production of documents, and (f) the opportunity to bring an expert witness or witnesses before the court, and (g) a declaratory judgment relating to the foregoing, and (f) a temporary restraining order as set forth above, and (e) such other and further relief as may be just and proper.

Dated January 14th, 2010

**Andrew C. Bailey, Plaintiff**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

NOTICE THAT EITHER EXHIBITS TO THIS ELECTRONICALLY FILED DOCUMENT ARE NOT ATTACHED OR ALL PAGES OF THIS DOCUMENT ARE NOT ATTACHED.

There were either one or more exhibits and/or other attachments filed with this pleading or the document filed consisted of pages too numerous for the clerk to scan and electronically file as part of the pleading. Paper copies of the exhibits or the entire document are maintained at the Office of the Clerk. They may be reviewed at that office 9:00 a.m. to 4:00 p.m., Monday to Friday, at 230 North First Avenue, Suite 101, Phoenix, Arizona.

BRIAN D. KARTH
CLERK OF COURT

Ana Wayman-Trujillo, Recorder
OFFICIAL RECORDS OF YAVAPAI COUNTY
CAPITAL TITLE AGENCY          DOT

B-4351 P-397
01/04/2006 10:49A
14.00  3961555

B-4351 P-397
Page: 1 of 4
DOT     3961555

Recording requested by:
**Wells Fargo Bank, N.A.**
**NICOLE HASTINGS**
**LOAN PROCESSOR**
**2202 W ROSE GARDEN LANE**
**PHOENIX, ARIZONA 85027**
**623-434-2800**

After Recording Return To:
Wells Fargo Bank, N.A.
Attn: Document Mgt.
P.O. Box 31557 MAC B6908-012
Billings, MT 59107-9900

State of Arizona
REFERENCE #: 20053123372511

Space Above This Line For Recording Data
ACCOUNT #:

# DEED OF TRUST
### (With Future Advance Clause)
### (Short Form)

1. **DATE AND PARTIES.** The date of this Short Form Deed of Trust ("Security Instrument") is **DECEMBER 23, 2005** and the parties are as follows:

   TRUSTOR ("Grantor"): **ANDREW C. BAILEY, AN UNMARRIED MAN AND CONSTANCE BAXTER MARLOW AN UNMARRIED WOMAN**

   whose address is: **2500 PAGE SPRINGS RD, PAGE SPRINGS, ARIZONA 86325**

   TRUSTEE: **Wells Fargo Financial National Bank c/o Specialized Services, PO Box 31557 Billings, MT 59107**

   BENEFICIARY ("Lender"): **Wells Fargo Bank, N.A., 101 North Phillips Avenue, Sioux Falls, SD 57104**

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Grantor's performance under this Security Instrument, Grantor irrevocably grants, conveys and sells to Trustee, in trust for the benefit of Lender, with power of sale, all of that certain real property located in the County of **YAVAPAI**, State of Arizona, described as follows:

Composite
Exhibit   A
1 & 2

AZDeed - short CDP.V1 (07/2002)

1/3

05, 10:02:20


with the address of  at <u>40727005 PAGE SPRINGS RD, PAGE SPRINGS, ARIZONA 86325</u> and parcel number of <u>407-27-005K-8</u> together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above.

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed <u>$ 202,500.00</u>. This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:

   A. Debt incurred under the terms of the promissory note, revolving line of credit agreement, contract, guaranty or other evidence of debt dated <u>DECEMBER 23, 2005</u>, together with all amendments, extensions, modifications or renewals. The maturity date of the Secured Debt is <u>DECEMBER 23, 2010.</u>

   B. All future advances from Lender to Grantor under such evidence of debt, whether obligatory or discretionary. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances which exceed the amount shown in Section 3. Any such commitment must be agreed to in a separate writing.

   C. All sums advanced and expenses incurred by Lender for insuring, preserving, or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

5. **RIDERS.** If checked, the following are applicable to this Security Instrument. The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument.

   [N/A] Third Party Rider

   [N/A] Leasehold Rider

   [N/A] Other:    N/A

6. **MASTER FORM DEED OF TRUST.** By the delivery and execution of this Security Instrument, Grantor agrees that all provisions and sections of the Master Form Deed of Trust ("Master Form"), inclusive, dated <u>January 15, 2001</u>, and recorded on <u>May 7, 2001</u> as Number <u>3347421</u> in Book <u>3830</u> at Page <u>19</u> of the Official Records in the Office of the Recorder of <u>YAVAPAI</u> County, State of Arizona, are hereby incorporated into, and shall govern, this Security Instrument. This Security Instrument does not incorporate any provision in the Master Form Mortgage that references a certain Home Equity Closing Handbook, such Handbook no longer being in existence.

**SIGNATURES:** By signing below, Grantor agrees to perform all covenants and duties as set forth in this Security Instrument. Grantor also acknowledges receipt of a copy of this document and a copy of the provisions contained in the previously recorded Master Form Deed of Trust (the Deed of Trust-Bank/Customer Copy).

Case 2:09-ap-01729-RTBP    Doc 7    Filed 01/19/10    Entered 01/20/10 15:56:53    Desc
Main Document    Page 12 of 61

01/20/2010

Grantor  ANDREW C. BAILEY                                    12/30/05
                                                                Date

Grantor  CONSTANCE BAXTER MARLOW                             12/30/05
                                                                Date

Grantor _____               _____
                                                                Date

Grantor _____               _____
                                                                Date

Grantor _____               _____
                                                                Date

Grantor _____               _____
                                                                Date

Grantor _____               _____
                                                                Date

Grantor _____               _____
                                                                Date

**ACKNOWLEDGMENT:**
(Individual)

State of Arizona

County of **YAVAPAI**

The foregoing instrument was acknowledged before me this 12/30/05_____ 20____ (date)
by **ANDREW C. BAILEY And CONSTANCE BAXTER MARLOW** (Name of person(s) acknowledged)

_____
(Signature of person taking acknowledgment)

Katherine L. Dreiling
Notary Public - Arizona
Yavapai County
Commission #215846
My Commission Expires August 26, 2009

_____
(Title)                    **Notary Public**

My commission expires: 8/26/09

AZDeed - short  CDP.V1  (07/2002)                                    3/3

Documents Processed 12-27-2005, 10:02:20

Exhibit A

A tract of land in the Southeast quarter of the Southeast quarter of Section 15, Township 16 North, Range 4 East of the Gila and Salt River Base and Meridian, Yavapai County, Arizona:

BEGINNING at the Southeast corner of Section 15 (a found GLO brass cap – 1938) from which the South quarter corner of Section 15 (a found GLO brass cap – 1938) bears North 89 degrees, 45 minutes, 37 seconds West, 2603.36 feet (BLM record North 89 degrees, 47 minutes West, 2606.34 feet);

Thence along the South boundary of Section 15, North 89 degrees, 45 minutes, 37 seconds West, 1301.68 feet (record North 89 degrees, 57 minutes, 49 seconds West, 1303.17 feet) to the Southwest corner of the Southeast quarter of the Southeast quarter of Section 15;

Thence along the West boundary of the Southeast quarter of the Southeast quarter of Section 15, North 07 degrees, 29 minutes, 01 seconds East, 284.18 feet (record North 07 degrees, 17 minutes, 21 seconds East, 288.10 feet) to a set ½ inch rebar with plastic cap (LS 25384) and the TRUE POINT OF BEGINNING.

Thence continuing along the West boundary of the Southeast quarter of the Southeast quarter of Section 15, North 07 degrees, 29 minutes, 01 seconds East, 278.90 feet (record North 07 degrees, 17 minutes, 21 seconds East, 278.85 feet) to a set ½ inch rebar with plastic cap (LS 25384);

Thence South 89 degrees, 53 minutes, 40 seconds East, 489.58 feet (record South 89 degrees, 57 minutes, 49 seconds East, 493.08 feet) to a found ½ inch rebar with plastic cap (LS 4491);

Thence along the West right-of-way line of Page Springs Road, South 03 degrees, 29 minutes, 57 seconds East, 41.53 feet (record South 03 degrees, 33 minutes, 23 seconds East, 41.54 feet) to a set ½ inch rebar with plastic cap (LS 25384);

Thence continuing along the right-of-way line and a curve to the left having a central angle of 18 degrees, 31 minutes, 13 seconds, a radius of 749.20 feet, a length of 242.17 feet, and a chord bearing South 12 degrees, 45 minutes, 46 seconds East, 241.12 feet (record central angle of 18 degrees, 31 minutes, 38 seconds, radius of 749.20 feet, length of 242.28 feet) to a found ½ inch rebar;

Thence North 89 degrees, 52 minutes, 22 seconds West, 292.33 feet (record North 89 degrees, 57 minutes, 49 seconds West, 292.28 feet) to a found ½ inch rebar;

Thence North 89 degrees, 56 minutes, 01 seconds West, 289.38 feet (record North 89 degrees, 57 minutes, 49 seconds West, 292.28 feet) to the TRUE POINT OF BEGINNING.

01/20/2010

**Wells Fargo Bank, N.A.**

NOTE DATE:      **DECEMBER 23, 2005**
MATURITY DATE:    **DECEMBER 23, 2010**
ACCOUNT#:
REFERENCE #:

## FIXED RATE LOAN NOTE
### (Partially Amortizing — Balloon)(Lot Loan)

**Borrower Name:**
ANDREW C. BAILEY

**Property Address:**
40727005 PAGE SPRINGS RD, PAGE SPRINGS, ARIZONA 86325

**Mailing Address for billing purposes (if different):**
N/A

## SECTION 1: MY LOAN

In this Note, the words, "I," "me," "my," and "Borrower" (which also means "we," "us," "our," and "Borrowers," if more than one borrower signs below) refer to each person who signs this Note. The words "you," "your," "Lender," and "the Bank" refer to Wells Fargo Bank, N.A., and any successor or assign or subsequent holder of this Note. Each person who signs this Note is jointly and individually bound by its terms and will be directly liable to the Bank for the entire amount owed on this Note, and each is liable as the principal and not merely as a guarantor.

If I make the regularly scheduled payments on this Loan, I will still owe a large sum at maturity. This Loan is payable in full at maturity. I must repay the entire Principal balance of the Loan and unpaid interest then due. The Bank is under no obligation to refinance the Loan at that time. I will, therefore, be required to make payment out of other assets that I may own, or I will have to find a lender, which may be the lender I have this Loan with, willing to lend me the money. If I refinance this Loan at maturity, I may have to pay some or all of the closing costs normally associated with a new loan even if I obtain refinancing from the same lender.

## SECTION 2: SECURITY INTEREST

I am giving the Bank a deed of trust, mortgage or other security instrument including all modifications, addenda and amendments to them (the "Security Instrument") signed the same date as this Note. The Security Instrument gives you a security interest in the property located at the address shown above (the "Property").

## SECTION 3: MY PROMISE TO PAY

In return for a loan that I have received (the "Loan"), I promise to pay __$202,500.00__ (this amount is called "Principal"), plus interest, to the order of the Bank. I understand that the Bank may transfer this Note. I will make all payments under this Note in U.S. Dollars.

## PAYMENTS

I will pay monthly payments of Principal and interest on the 23RD day of each month beginning on January 23, 2006. My monthly payment will be in the amount of U.S. $1,263.85.

Fixed Rate Loan Note, HCWF#144v18_AZ_144 (04/04/05)                               1/8

Documents Processed 12-30-2005, 15:24:11

Composite
Exhibit A
1 & 2

Case 2:09-bk-06378-RTBP   Doc 7   Filed 01/19/10   Entered 01/20/10 15:56:53   Desc
Case 2:09-ap-01729-RTBP   Doc 7   Filed 01/19/10   Entered 01/20/10 15:56:53   Desc
Main Document     Page 15 of 61

01/20/2010

On DECEMBER 23, 2010, I will pay a final balloon payment equal to the unpaid Principal plus all remaining interest, fees and other sums owed under this Note and the Security Instrument. I understand that the Bank is not under any obligation to refinance my final balloon payment.

I will make payments at the Bank's address indicated on my payment coupon or my billing statement, unless another payment method is authorized by the Bank. Each non-electronic payment I make will be accompanied by the remittance portion of my billing statement or payment coupon.

I understand that payments I make by mail to the address indicated on my billing statement or payment coupon will be credited to my Loan as of the date received (including Saturdays, Sundays, and holidays) if the Bank receives the payment prior to 5 p.m. local time for the payment address.

Payments I make from a qualified account ("Automatic Payments") pursuant to an Authorization for Automatic Transfer will be credited to my Loan on the date received (including Saturdays, Sundays, and holidays).

Payments I make at a Bank branch and received prior to established cut-off times will be credited to my Loan on the business day the payment is received by the Bank. For purposes of this rule, a business day includes any day other than Saturdays, Sundays, and Bank observed holidays. Payments made at a Bank branch received on a Saturday, Sunday, or Bank observed holiday or after established cut-off times will be credited as of the next business day.

Payments I make online, by ATM, by telephone, or by any other means the Bank may make available to me and received prior to established cut-off times will be credited to my Loan on the business day the payment is received by the Bank. For purposes of this rule, a business day includes any day other than Saturdays, Sundays, and federal holidays. Payments made online, by ATM, by telephone, or by any other means the Bank may make available to me received on a Saturday, Sunday, or federal holiday or after established cut-off times will be credited as of the next business day.

I will not make payment or authorize others to make payment for me by means of a single aggregated payment, which includes payments for this Loan and any other account(s), unless the payment is made in compliance with the Bank's requirements for multiple account payments.

The Bank may accept late payments, partial payments, post-dated checks, or any form of payment containing a restrictive endorsement, without losing any of the Bank's rights under this Note. The Bank's acceptance of checks or money orders labeled "payment in full," or words to that effect, will not constitute an accord and satisfaction nor a waiver of any rights the Bank has to receive full payment. If I intend to condition a payment, pay the Loan in full with less than the total amount owed, or give payment instructions, I will clearly set out such intention, conditions and instructions in a separate letter accompanying my payment, and mail both to Wells Fargo Bank, N.A., P.O. Box 2993, Portland, OR 97208.

### PRINCIPAL PAYMENTS BEFORE THEY ARE DUE
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Principal Reduction." When I make a Principal Reduction, I will tell the Bank in a letter that I am doing so.

## SECTION 4: INTEREST

I will pay interest at a simple annual interest rate of __6.375__%. Interest will be charged on the unpaid Principal until the full amount of Principal has been paid. The interest rate required by this Section 4 is the rate I will pay both before and after any default under this Note.

## SECTION 5: AUTOMATIC PAYMENT DISCOUNT

I understand that I should consult a tax advisor regarding the deductibility of interest and charges under my Loan.

## SECTION 12: DEFAULT

I will be in default if any one of the following occur:

- I fail to pay the full amount of any payment when due.
- I commit fraud or make a material misrepresentation in connection with this Note.
- A case under the U.S. Bankruptcy Code is started by or against me.
- Any action or inaction by me adversely affects the Bank's security in the Property, including, without limitation, transfer of the Property without the Bank's consent.
- The Bank believes in good faith that I may not be able or willing to pay as promised.
- Any person who has signed this Note dies.
- If I am an executive officer of the Bank and federal law governing credit extended by a bank to its executive officer, including without limitation Section 215.5(d)(4) of Federal Reserve Regulation O (12 CFR § 215.5(d)(4)), permits or requires immediate payment of all outstanding Principal, interest and any other charges that I may owe under this Note.

If I am in default, subject to any notice and right to cure required by applicable law, the Bank may require me to pay immediately all sums I owe under this Note. Even if, at the time when I am in default, the Bank does not require me to pay immediately in full as described above, the Bank will still have the right to do so if I am in default at a later time.

## SECTION 13: FURTHER ASSURANCES

I agree that I will take any steps including but not limited to signing, filing or recording any documents which are necessary, or which the Bank deems appropriate, to be sure that my obligations to the Bank under this Note become and continue to be secured by the Security Instrument.

## SECTION 14: CHANGE IN RESIDENCE OR OWNERSHIP OF THE PROPERTY

I agree to notify the Bank immediately if (a) the Property is my primary residence and I cease to live in the Property as my primary residence, or (b) there is any change in the ownership of the Property. I agree that my Loan will be accelerated and the outstanding balance of my Loan will be due and payable immediately on any sale or other transfer of the Property. In this regard, I understand that the Security Instrument contains the following or a substantially similar provision:

> Upon sale, transfer, hypothecation, assignment or encumbrance, whether voluntary, involuntary, or by operation of law, of all or any part of the Property or any interest therein, then at its sole option, the Bank may, by written notice to Trustor (or Grantor or Mortgagor), declare all obligations secured hereby immediately due and payable, except to the extent that such acceleration and in such particular circumstances where exercise of such a right by the Bank is prohibited by law.

## SECTION 15: WAIVERS

### BORROWER'S WAIVERS

I waive my rights to require the Bank to do certain things. Those things are: (a) to demand payment of amounts due (known as "presentment"); (b) to give notice that amounts due have not been paid (known as "notice of dishonor"); (c) to obtain an official certification of nonpayment (known as "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Bank if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else, waives these rights. These persons are known as "guarantors, sureties and endorsers."

Case 2:09-bk-06979-RTBP    Doc 79-1    Filed 11/06/09    Entered 11/06/09 15:44:21
Desc Exhibit A and B    Page 4 of 22
Case 2:09-ap-01729-RTBP    Doc 7    Filed 01/19/10    Entered 01/20/10 15:56:53    Desc
Main Document    Page 17 of 61

01/20/2010

## BANK'S NON-WAIVER

The Bank may fail to make use of any of its rights under this Note or the Security Instrument or under applicable law on one or more occasions, or delay or partially exercise such rights, without waiving any of its rights or amending any of my obligations. The Bank may fail to make use of any of its rights or delay or partially exercise such rights against one party, without waiving any of its rights against any other party to this Note.

## SECTION 16: CREDIT REPORTS

My signature on this Note authorizes the Bank to obtain my credit report in connection with (a) renewing, modifying or extending this Note; (b) reviewing my Loan; (c) taking any collection action; and (d) any other legitimate purposes associated with my Loan.

## SECTION 17: GOVERNING LAW; SEVERABILITY

All interest, fees and other amounts charged or accruing in connection with this Note, which are considered "interest" within the meaning of Section 85 of the National Bank Act (12 USC § 85; 12 CFR 7.4001(a)), shall be governed by and interpreted under South Dakota law. In all other respects, this Note and all related documents, as well as the rights, remedies, and duties of the Bank and the Borrower(s), shall be governed and interpreted by federal law with respect to national banks and to the extent not preempted by federal law, the laws of the state in which the Property is located.

If any provision of this Note or the Security Instrument is determined to be invalid or unenforceable as the result of arbitration pursuant to Section 18 below or as the result of any court proceeding permitted under Section 18 below, the rest of this Note will remain in full force and effect and enforceable according to its terms. All references in this Note to the singular shall include the plural and vice versa.

## SECTION 18: ARBITRATION

### NON-JUDICIAL RESOLUTION OF DISPUTES

If I have a dispute with the Bank, and I am not able to resolve the dispute informally, I agree that any dispute, regardless of when it arose, shall be resolved by the following arbitration process. I understand and agree that both myself and the Bank are each waiving the right to a jury trial or a trial before a judge in a public court.

### DISPUTES

A dispute is any unresolved disagreement between me and the Bank. It includes any dispute relating in any way to accounts or services described in this Note; to my use of any Bank location or facility; or to any means I may use to access the Bank, such as an automated teller machine (ATM) or on-line Internet banking. It includes claims based on broken promises or contracts, torts (injuries caused by negligent or intentional conduct) or other wrongful actions. It also includes statutory, common law and equitable claims. A dispute also includes any disagreement about the meaning of these Arbitration provisions, and whether a disagreement is a "dispute" subject to binding arbitration as described in these Arbitration provisions. A dispute does not include a claim that may be filed in small claims court. If I have a dispute that is within the jurisdiction of the small claims court, I agree to file my claim there.

### BINDING ARBITRATION

Binding arbitration is a means of having an independent third party resolve a dispute without using the court system, judges or juries. Either the Bank or I may require the submission of a dispute to binding arbitration at any reasonable time notwithstanding that a lawsuit or other proceeding has been commenced. If either party fails to submit to binding arbitration following a lawful demand, the one who fails to so submit bears all costs and expenses incurred by the other compelling arbitration. Neither I nor the Bank shall be entitled to join or consolidate disputes by or against others in any arbitration, or to include in any arbitration any dispute as a

Case 2:09-bk-06979-RTBP   Doc 79-1   Filed 11/06/09   Entered 11/06/09 15:44:21

Case 2:09-ap-01729-RTBP   Doc 7   Filed 01/19/10   Entered 01/20/10 15:56:53   Desc
Main Document     Page 18 of 61

01/20/2010

representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity. Each arbitration, including the selection of the arbitrator(s) shall be administered by the American Arbitration Association (AAA), according to the Commercial Arbitration Rules and the Supplemental Procedures for Consumer Related Disputes ("AAA Rules"). To the extent that there is any variance between the AAA Rules and these Arbitration provisions, these Arbitration provisions shall control. Arbitrator(s) must be members of the state bar where the arbitration is held, with expertise in the substantive laws applicable to the subject matter of the dispute.

The Bank and I each agree that in this relationship:
- The Bank and I are participating in transactions involving interstate commerce;
- Each arbitration is governed exclusively by the provisions of the Federal Arbitration Act (Title 9 of the United States Code).

To find out how to initiate an arbitration proceeding, a party may call any office of the AAA or visit the AAA online at www.adr.org.

## RIGHTS PRESERVED
These Arbitration provisions and the exercise of any of the rights I and the Bank have under these Arbitration provisions do not stop me or the Bank from exercising any lawful rights to use other remedies available to preserve, foreclose or obtain possession of real or personal property; exercise self-help remedies, including setoff and repossession rights; or obtain provisional or ancillary remedies such as injunctive relief, attachment, garnishment or the appointment of a receiver by a court having jurisdiction.

## MISCELLANEOUS
The Bank and I each agree to take all steps and execute all documents necessary for the implementation of arbitration proceedings. The arbitrator may hear and rule on appropriate dispositive motions as part of the arbitration proceeding, such as motions for judgments on the pleadings, summary judgment or partial summary judgment. The AAA, the arbitrators, the Bank and I must, to the extent feasible, take any necessary action to assure that an arbitration proceeding, as described in these Arbitration provisions, is completed within 180 days of filing the dispute with the AAA, unless otherwise determined by the arbitrator. These parties must not disclose the existence, content or results of the arbitration, except for disclosures of information required in the ordinary course of business or permitted by applicable law or regulation. This requirement shall be liberally construed in order to ensure the enforcement of these provisions. Arbitration proceedings are conducted in the state in which I opened my account or at a location determined by the AAA.

All statutes of limitations applicable to any dispute apply to any arbitration between me and the Bank. These Arbitration provisions shall survive termination, amendment or expiration of my account relationship or the governing account agreement or any other relationship between me and the Bank. These Arbitration provisions constitute the entire agreement between the parties and supersede all prior arrangements and other communications concerning dispute resolution. If more than one arbitration agreement entered into by me and the Bank is potentially applicable to a dispute, the one most directly related to the account or transaction that is the subject of the dispute shall control.

## FEES AND EXPENSES OF ARBITRATION
I agree to pay the applicable AAA filing fee when I submit my written request for arbitration to the AAA. The AAA's filing fee and administrative expenses for an arbitration on documents alone without oral hearing, will be allocated according to the AAA Rules, except that for claims of less than one thousand dollars ($1,000.00), I will only be obligated to pay a filing fee of fifteen dollars ($15.00) and the Bank will pay all of the AAA's other costs and fees. At my written request, the Bank will temporarily advance up to five hundred dollars ($500.00) towards the filing, administrative and/or hearing fees for any dispute in excess of one thousand dollars ($1,000.00) which I may file against the Bank, after I have paid an amount equivalent to the fee, if any, for filing a claim for such a dispute in state or federal court (whichever is less) in the judicial district in which I reside. However, if I elect an in-person arbitration process, I must pay my share of the higher administrative fee and the additional costs for this process. At

Fixed Rate Loan Note, HCWF#144v18_AZ_144 (04/04/05)

6/8

the conclusion of the arbitration, the arbitrator will decide who will ultimately be responsible for paying the filing, administrative and/or hearing fees in connection with the arbitration including, but not limited to, those costs and fees paid by the Bank on my behalf. Unless inconsistent with applicable law, each party shall bear the expense of that party's own attorneys', experts' and witness fees, regardless of which party prevails in the arbitration.

## SECTION 19: NOTICES

Unless applicable law requires a different method, any notice that must be given to me or to anyone else who signs, guarantees or endorses this Note may be given by mailing it to my address as set forth above in this Note, or to a different address if I have properly notified the Bank of that different address. Any notice that I may send to the Bank must be given by mailing it to the Bank at the address provided on my billing statement or payment coupon, unless the type of notice is more specifically addressed in this Note and a different address is provided herein.

I agree that the Bank may contact me by telephone. I agree to accept calls from the Bank at any telephone number that I provide to the Bank.

## SECTION 20: ADDENDA

I agree to the following attached addenda:
N/A

## SECTION 21: STATE DISCLOSURES

N/A

### NOTICE TO THE BORROWER

DO NOT SIGN THIS NOTE IF IT CONTAINS BLANK SPACES. ALL SPACES SHOULD BE COMPLETED BEFORE THIS NOTE IS SIGNED. READ THIS NOTE BEFORE SIGNING IT.

### ACKNOWLEDGMENT

I have received, read and retained a copy of this Fixed Rate Loan Note, the Security Instrument and the Truth-in-Lending Disclosure Statement, provided to me at the closing, all of which I agree to by signing this Fixed Rate Loan Note. If this Loan is secured by a dwelling, I have also received, read and retained a copy of the Agreement to Provide Insurance and the HUD Settlement Statement provided to me at the closing. In addition, I hereby agree that the terms of this Fixed Rate Loan Note replace the terms of any and all prior oral or written agreements, including by way of example only, commitment letters and pre-approval letters between the Bank and me.

Case 2:09-bk-06979-RTBP    Doc 79-1    Filed 11/06/09    Entered 11/06/09 15:44:21
Case 2:09-ap-01729-RTBP    Doc 7    Filed 01/19/10    Entered 01/20/10 15:56:53    Desc
Main Document    Page 20 of 61

01/20/2010

_[signature]_

BORROWER ANDREW C. BAILEY      (Seal)     12·30·05

                                                  DATE SIGNED

BORROWER                     (Seal)

                                                  DATE SIGNED

BORROWER                     (Seal)

                                                  DATE SIGNED

BORROWER                     (Seal)

                                                  DATE SIGNED

BORROWER                     (Seal)

                                                  DATE SIGNED

BORROWER                     (Seal)

                                                  DATE SIGNED

BORROWER                     (Seal)

                                                  DATE SIGNED

BORROWER                     (Seal)

                                                  DATE SIGNED

Fixed Rate Loan Note, HCWF#144v18_AZ_144 (04/04/05)

                                                             8/8

                                         Documents Processed 12-30-2005, 15:24:11

Case 2:09-bk-06979-RTBP    Doc 79-1    Filed 11/06/09    Entered 11/06/09 15:44:21
Case 2:09-ap-01729-RTBP   Doc 7   Filed 01/19/10   Entered 01/20/10 15:56:53    Desc
                  Main Document      Page 21 of 61

                                                                01/20/2010

# RESUME

## *NEIL F. GARFIELD*

*4980 S Alma School Rd A-2*
*480-895-5443 Fax: 772-594-6244*
*email: Ngarfield@msn.com*

## SUMMARY:

Varied and integrated professional and business background in the following areas --- *investment banking, derivative security baskets, electronic funds transfer, management, information systems, accounting, auditing and law.*

✓ Currently teaching lawyers, judges, legislators, and layman in the Garfield Continuum Seminars for Attorney CLE credit and general information, appearing on numerous radio and TV broadcasts, Garfield is the Editor in Chief of livinglies.wordpress.com, a blog site that has reached over 1 million visits and is widely regarded as the premier resource on the internet for foreclosure cases, opinion, links to law reviews, practice guides and current events the foreclosure of securitized mortgages. Garfield draws on his Wall Street experience and trial lawyer years combined with intensive analysis of derivatives, securitized financial products and personal relationships developed over the years which give him unique insights into the realities of Wall Street in the Mortgage Meltdown of 2001-2009.

✓ Starting out on **Wall Street**, he became proficient in the language and conduct of highly complex financial transactions. At an early age, Mr. Garfield personally handled the negotiations leading to successful **mergers, acquisitions, multimillion dollar financing, IPO's, secondary offerings, and private financing** for dozens of companies.

✓ He then achieved his **MBA and JD degrees with distinction**, and began a 35 year law and business consulting career.

✓ Following his law career he assumed control of two **public companies** for which he successfully structured financing and merger programs, **creating and implementing novel business and marketing plans for information systems** storage and retrieval including a mobile platform for backfile conversion for clients who were installing imaging systems. Initial clientele included **Fannie Mae, Chemical Bank, the Securities and Exchange Commission, the New Mexico Legislature**, and a host of Universities and Government agencies. Under his direction the publicly traded stock increased market value from **$150,000 to $45,000,000** in nine months.

✓ Following that engagement, he bought out the **ATM/POB portfolios** of several different companies now consolidated under EFT Systems, Inc., d/b/a American Bank Card, which now manages more than **$30 million** in electronic payments for retail sales, **an increase of 250%**. The EFT's **business expanded** to include **prepaid debit cards, ACH origination, and technology consulting** to banks and independent sales organizations.

✓ As president of American Bank Card, he created, funded and implemented the business plan for a cooperative marketing channel to community banks for technology sales, deployment, and support. He is now **General Counsel to the SMART cooperative of community banks** that includes a newly launched bank network, and a host of electronic funds transfer services on behalf of bank and private enterprise clients.

Exhibit B

**WALL STREET BACKGROUND:**

With a family securities business in his background (Garfield and Co. Members NYSE, AMEX etc.) Mr. Garfield started off as a trainee securities analyst and quickly rose to be Director of Research and Director of Mergers and Acquisitions at well-respected brokerage houses on Wall Street. At the end of this portion of his career, Mr. Garfield concurrently studied for his **MBA *magna cum laude.*** He was licensed as a registered representative 1968-1972.

**LAW CAREER**

Following his investment banking career, Mr. Garfield moved to Florida where he studied law and was awarded his **JD degree *cum laude.*** Concurrently with his studies, he was the business manager for a small law firm in Fort Lauderdale.

A member of the **Florida Bar** since 1977, he devoted most of his time to practicing law from 1977 through 1992. He is also a member of the **Federal Trial Bar**, the Federal Bankruptcy Bar, and several national and local committees. Until his semi-retirement in December, 1992 he was also a member of The Florida Trial Lawyers Association, the American Bar Association and the West Broward Bar Association. He has served on committees for the Florida Bar and was a volunteer, early in his legal career for the Florida Bar Committee for mental disability law reform, where he represented individuals incarcerated for reasons associated with mental disabilities (pro bono).

He received his Undergraduate Degree from Dickinson College in 1968, his MBA from Iona College in 1974, Magna Cum Laude, and his Juris Doctor from Nova University Center for the Study of Law in 1977, Cum Laude.

The concentration of his law practice was in the areas of commercial transactions, commercial litigation, condominium law, administrative law and bankruptcy. He has been the recipient of **numerous academic awards** in business and law, including:

    **LAW**
    *American Jurisprudence Award in Torts
    *American Jurisprudence Award in Commercial Transactions
    *American Jurisprudence Award in Federal Jurisdiction
    *Horn Book Award for outstanding scholastic achievement from Nova University Law Center
(first out of 175 students)
    **BUSINESS, ACCOUNTING AND TAXATION**
    *Medal for Academic Excellence 1974, MBA, (first in a two-year program of 159 students)
    *Who's Who Among Students in American Universities and Colleges - 1974 - Iona College

Concurrently with his law career, he was frequently retained as a **business consultant** to small and medium sized businesses. Mr. Garfield assumed the Presidency of two public companies in 1992 and was charged with the responsibility of finding and closing on mergers, acquisitions, financing, and developing the business plans of those entities through the acquisition of qualified personnel. At the commencement of his engagement, neither company had any assets other than loosely defined business plans. In an 18 month period these companies **raised over $2.5 million in cash, made acquisitions for real estate valued in excess of $8 million,** and acquired several operating companies. In addition, the business plans of the companies were refined, placing DIS as the leading company in the field of backfile conversion (conversion of hard copy documents into computer storage) and consulting on information systems, storage and retrieval. During that tenure he managed 45 employees.

1968 - 1969: Director Research Department, and Registered Representative, Spingarn, Heine Company, Members, NYSE, AMEX, etc.

1968 Trainee - Security Analyst and Registered Representative, A.L. Stamm & Company, Members, NYSE, AMEX, etc.

## TEACHING AND PUBLIC SPEAKING EXPERIENCE:

1. Iona College **Graduate School** of Business Administration: Taught individual classes in a variety of management, auditing and accounting courses as substitute for usual professor.

2. Broward Community **College**: Taught variety of subject dealing with law and business for adult education. Guest lecturer on business, law, and psychology of learning and performance.

3. **Seminars**: Conducted numerous seminars in law, business and personal development. Methods employed: lecture, Socratic and experiential. Garfield Continuum Seminars on Foreclosure Defense, Litigation and Securitized Mortgages is qualified for Continuing Legal Education Credits in 26 states varying from 6.5 to 9.5 credits.

4. **Trials**: Every trial is an educational seminar for the jury or judge. In the course of 17 years of practice, has appeared as lead counsel in over 2000 contested hearings, bench trials and jury trials and approximately 20 oral arguments on appeal.

5. **Radio**: In 1985-1986, host of several radio programs, including the Neil Garfield Condo Connection show on what was then WGBS. This program dealt with educating the public concerning the law and practice as it related to living in condominiums, cooperatives, and home owner associations.

6. **Television**: Periodically over the years has appeared as the spotlighted guest or on a panel on PBS and other stations relating to condominium law, administrative law, and general business subjects.

7. *Currently preparing curriculum for seminar and matriculated course offerings in electronic commerce and electronic banking.*

## PERSONAL:

Married December 6, 2003 to Joyce Molloy Children: Marc Andrew Garfield DPM (40, prior marriage, **Podiatrist**) Virginia beach, Va., Chelsea Lauren Garfield (35, prior marriage, Director of Website for Citizens property Insurance, Florida, Danielle Kinorah Garfield, age 20, attending Broward Community College, Cocnut Creek, FloridaAmerican Heritage School in Plantation, Florida. Brother, Gary J. Garfield, M.D., is a practicing **Cardiologist** in Coral Springs, Florida. Father, Frederick M. Garfield, M.D., was a retired **Physician**. Cousin, Brian Garfield is an **Author** in Hollywood, California ("Death Wish,", "Hopscotch", "Kolchak's Gold," etc.). Hobbies include music (keyboard player), reading and travel. The Garfield family created the **first fully U.S. automated pharmaceutical plant** at the beginning of this century. It is now an exhibit at the Smithsonian Institute in Washington, D.C.. The family also created and patented the process by which lanolin is extracted from cholesterol, providing the base for all cosmetics and paints made in the world.

**ANDREW C. BAILEY**
2500 N. Page Springs Rd

Cornville, AZ 86325

928 634-4335

*Debtor in Pro Per*

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

| Andrew C. Bailey | Chapter 11 |
|---|---|
| Plaintiff | |
| | **Case# 2:09–ap–01729–RTBP** |
| vs. | **DECLARATION OF NEIL FRANKLIN GARFIELD AS EXPERT WITNESS** |
| WELLS FARGO BANK, NA | |
| Defendant | |

STATE OF ARIZONA    )
                        )   ss.
County of Maricopa    )

Neil Franklin Garfield, deposes and states unsworn under penalty of perjury as follows:

1.     I am over the age of eighteen years and qualified to make this affidavit.

2.     I have been a licensed member in good standing of the Florida Bar FBN 229318

1

Exhibit C

since May 31, 1977

3.      I am the author and editor of www.livinglies.wordpress.com a blog site on the

Internet which contains most of the public records and public domain reports,

articles, books, treatises and documentation upon which I rely for my opinion in this

case. I am the author of the manuals and workbooks that are used to accompany

the workshops and seminars that present under the name GARFIELD

CONTINUUM. Those manuals are the nearest thing available in the marketplace to

treatises involving foreclosure of securitized residential mortgages. In addition I have

an indirect interest in Foreclosure Defense Group that performs forensic analysis of

loan documents, title examinations, analysis of securitization documentation, and

prepares Qualified Written Requests, Debt Validation Letters and demand letters for

clients, most of whom are attorneys licensed in the jurisdiction in which the subject

property is located. Foreclosure Defense Group sponsors the Garfield Continuum

Seminars in which I teach laymen and lawyers to understand civil procedure,

evidence, motion practice, discovery, ethics, securitization theory and practice,

defensive and offensive strategies with servicers, MERS, Trustees, mortgage

brokers, "originating lenders," investment bank underwriters, special purpose

vehicles and bond issuance. Subjects also include elements of property law,

contract law, negotiable instruments, Uniform Commercial Code, tort law and

consumer protection under Federal and State enabling legislation.

4.      I have recently testified at deposition as an expert in the class action suit in Case

2

No.: 3:09-cv-180-ECR-VPC, United States District Court District of Nevada,[1] to render opinions in the topic areas related to the securitization of mortgage loans, derivative securities, the securities industry; real property law, Uniform Commercial Code practices, predatory lending practices, Truth in Lending Act requirements, loan origination and underwriting, accounting in the context of securitization and REMIC entities, Special Purpose Vehicles, Structured Investment Vehicles, pooling and servicing of securitized loans, assignment and assumption of securitized residential mortgage loans, creation of trusts under deeds of trust, pooling agreements, and issuance of asset backed securities and specifically mortgage-backed securities by special purpose vehicles in which an entity is named as trustee for the holders of certificates of mortgage backed securities, the economics of securitized residential mortgages during the period of 2001-2008, appraisal fraud and its effect on APR disclosure, usury, exceeding the legal limit for interest charged, non-judicial foreclosure of securitized and non-securitized residential mortgages, and judicial foreclosure of securitized and non-securitized residential mortgages, all particularly as to the laws of the State of Arizona, California, Florida and Ohio, based upon the

---

1    JOSEFA S. LOPEZ, JOSE TRINIDAD CASAS, MARIA C. CASAS, LYNDON B.GRAVES, TYRONE EVENSON, MICHELLINA EVENSON, BRYAN GRAY, HELEN GRAY, PATRICK FRANKOSKI, and CHRISTOPHER PETERNELL, individually and on behalf of a class of similarly situated individuals, Plaintiffs vs. EXECUTIVE TRUSTEE SERVICES, LLC.; COUNTRYWIDE HOME LOANS, INC., a New York corporation; MERSCORP, INC., a Virginia corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a subsidiary of MERSCORP, Inc., a Delaware corporation; RECONTRUST, SAXON MORTGAGE SERVICES, INC., GALE GROUP dba T.D. FINANCIAL SERVICES dba T.D. SERVICE COMPANY, SECURITY UNION TITLE INSURANCE COMPANY, CAPITAL ONE dba CHEVY CHASE BANK, NATIONAL DEFAULT SERVICING CORPORATION, FEDERAL HOME LOAN MORTGAGE CORPORATION, a Virginia corporation; FEDERAL NATIONAL MORTGAGE ASSOCIATION, a District of Columbia corporation; GMAC MORTGAGE, L.L.C., a Delaware corporation; NATIONAL CITY  MORTGAGE, a foreign company and a division of NATIONAL CITY BANK, a subsidiary of National City Corporation; NATIONAL CITY CORPORATION,  a Delaware corporation and a subsidiary of PNC Financial Services, Inc.; PNC FINANCIAL SERVICES, INC., a Pennsylvania corporation; J.P. MORGAN CHASE BANK, N.A., a New York corporation; CITIMORTGAGE, INC., a New York corporation; HSBC MORTGAGE CORPORATION, U.S.A., a Delaware corporation; AIG UNITED GUARANTY CORPORATION, a foreign corporation; WELLS FARGO BANK, N.A., a California corporation, d/b/a WELLS FARGO HOME EQUITY and d/b/a WELLS FARGO HOME MORTGAGE, a division of WELLS FARGO BANK, N.A., a California corporation; BANK OF AMERICA, N.A., a Delaware corporation, and GE MONEY BANK, an Ohio corporation;  JOHN AND JANE

3

credentials in the Resume attached hereto.

5.    I have no direct or indirect interest in the outcome of the case at Bar for which I am offering my observations, analysis, opinions and testimony. The cost of my preparation, analysis, review, meetings, teleconferences, appearances and all other work is $500 per hour plus all out of pocket expenses all of which must be prepaid regardless of outcome.

6.    With respect to **Case #: 2:09-bk-06979-PHX-RTBP and related matters in administrative and judicial proceedings** I have received and reviewed some of the pleadings and memorandums, some of the orders entered, conferred with the forensic analyst that reviewed the purported loan closings on the subject properties, the closing loan documents and additional pleadings relating to the subject "loan" transactions. I have confirmed the information related to me through my review of said closing documentation, as well as my own internet searches with respect to the parties purporting to be the "Lender" (see end-note 1) in the transaction subject to the instant matters.

7.    My opinions are based upon public records and documentation written or prepared by the purported originating parties that are named or designated as a "lender"[i] or "beneficiary" or "Payee" or "trustee" in the contracts and deed executed by the homeowner in this case, as well as the documentation that in my opinion was relevant to the securitization of the financial product sold to the homeowner as a residential home loan and simultaneously or contemporaneously sold as a financial

---

DOES I-X; BLACK AND WHITE PARTNERSHIP I-X.

4

product to an investor. In my opinion, both financial products (i.e., the transaction with the property owner and the transaction with the creditor/investor who purchased mortgage-backed bonds from an entity that was not disclosed at closing to the property owner) were securities, and neither set of securities were properly registered or regulated. The information that would reveal the identity(ies) of the creditor(s) has been withheld from Debtor. It can only be said, in the context of an absence of answers to the qualified written requests that the creditor can be described but not identified. The initiating parties in foreclosure are not creditors and do not appear to have ever advanced money, goods or services, nor did they enter into any arrangement wherein they expected payment to be due to them. Rather, as is apparent from the information at hand, the payment was, as is always the case, due to the creditor who advanced the money or his/her/its successor. The parties have assumed the identity of "beneficiary", "lender" and/or "payee" despite the fact that the loan was securitized which means that it was sold to investors who were the source of the advance of funds. Since the sale of bonds to the investor is customarily a transaction that precedes the sale of the financial product sold to the property owner, it is my opinion that it may be fairly and reasonably assumed that at the time the documents were executed, the creditor was the bond holder, contrary to the nominal designations on the closing documents.

8.     The customary practice in securitization of residential mortgage loan products was to withhold information concerning the identity of the creditor and to withheld the disclosure of profits and fees made on the multiple yield spreads and premiums paid

*5*

thereon, amounting in this case to a substantial portion of the total principal of the loans themselves, using average data from the marketplace congruent with the time and place of these transactions. The actual information that would provide the identity of the creditor and thus allow inquiry for a complete accounting and audit of the subject transactions is in the sole care, custody and control of the loan servicer or another intermediary conduit in the securitization chain, including but not limited to the Trustee or depositor for the Special Purpose Vehicle that re-issued the homeowner's note and encumbrance as a derivative hybrid debt instrument (bond) and equity instrument (ownership of percentage share of a pool of assets, of which the subject loan was one such asset in said pool).

8.1. According to information from Debtor, Debtor has made unsuccessful attempts through industry standard letters requesting the identity of the lender, the documentation authenticating the identity of the lender, and an accounting from the lender as to all money paid or received in connection with the subject obligation.

8.2. At such time that the intermediary participants in the securitization comply with the requests for said information, I will be able to identify with certainty the true owner of the alleged obligation, thus enabling me to provide the court with a complete description of the entire transaction starting with the creditor and ending with the debtor and any co-obligors or other conditions added during the process of securitization of the loan product sold to the property owner. In such event the identity of the creditor(s) and the opportunity to obtain a full accounting

6

will be present. Until then, I am dealing with only partial information in that there are four parts to the required accounting:

8.2.1. The debits and credits arising from the moment of the closing of the subject transactions

8.2.2. The debits and credits arising from transactions between the property owner and each servicer

8.2.3. The debits and credits arising from transactions with third parties either during or after the first phase of securitization was completed

8.2.4. The debits and credits arising from transactions in which insurance proceeds or other third party proceeds were received and distributed including the Federal Reserve, Federal Agencies, the U.S. Department of the Treasury, The FDIC and other unknown and therefore unnamed parties.

8.3. Until such time as the full accounting is available and subject to audit, it is impossible to know the amount due from the property owner on the obligation that might have been created at the alleged closing of the subject transactions.

8.4. Without knowing the amount due on the obligation it is therefore impossible to determine whether a default exists, and if so, who is suffering financial loss as a result of the default.

8.5. Until such time that the identity is revealed by Defendants, I must rely upon internet searches making certain presumptions regarding the subject loan transactions. The main presumptions are that the standards of the industry were followed in the securitization of the subject transaction and that the subject

7

transactions were in fact securitized. I arrive at those conclusions both from information appearing in the record and from my knowledge that where these particular parties are involved, the probability of securitization is nearly 100%. The prospectus that was filed with the SEC apparently covering the parties and time period consistent with the Bailey "Loan" Transaction reveals explicit terms and conditions upon which I base my opinions.

8.6.      In my opinion the party identified as "LENDER" "originated" loans acting as a mortgage broker and not as a mortgage lender. The real lender was the source of funds advanced for the funding of the loan. I rely upon common definitions of creditor, debtor, lender etc. found in bankers' glossaries, law dictionaries, and through my practical experience and training in securities analysis, underwriting, my training in law school, my training in business school and my experience on Wall Street, and as a practicing lawyer in commercial transactions and commercial litigation.

8.7.      Answers are required either in response to the qualified written request or through discovery. Confirmation of my opinions would include but not be limited to the manner in which each firm in the securitization reflected the transaction on its own financial records. In most cases it appears merely as fee income or profit on sale which would confirm that the party never was a creditor.

8.8.      It appears as though all originated loans were subject to previously existing agreements including Pooling and Service Agreements and Assignment and Assumption Agreement, in which the originated loans were already pledged

8

or conveyed to third parties (investors/creditors/LENDERS) at the time of Plaintiff's "closing."

8.9.     At each level of securitization a successor "Trustee" was named purporting to acquire all powers of the "Trustee" before the loan was transmitted, transferred, sold or hypothecated to another party. In each case there does not appear to actually be a "Trust" as the beneficiaries of each "Trust" are either ambiguous or not present at all.

8.10.    In each case the nominal "Trust" actually contained no assets, the same having been transferred to yet another entity PRIOR to the existence of the subject transaction.

8.11.    In the case of the entity that issued bonds to the creditors as mortgage backed securities, in each case the mortgages to back those securities did not yet exist. In each case, though, the body of the bond indenture explicitly conveys a percentage interest in the "pool" to the creditor forming what appears to be a general partnership, with the indenture in reality being a partnership or operating agreement.

8.12.    In each case, the "Trustee" is named but then described and its powers circumscribed increasingly as one reads through the enabling document, such that it appears that the party named as "Trustee" is in actuality an agent with very limited powers.

8.13.    In many cases and in particular with the parties involved in this litigation, they were the recipients of proceeds from the Federal Reserve that "purchased"

9

01/20/2010

the mortgage backed securities, thus making the Federal Reserve the creditor in whole or in part in these subject transactions.

8.14.     Typically all such indentures create a hybrid security that is both bond and equity, to wit: the bond provides for a stated interest rate of return and provides ownership of a percentage of a pool of assets comprised of residential loans, which would most certainly have included the subject loan.

8.15.     In many cases the "trusts" were disbanded and no longer exist as legal entities. Without further disclosure from these parties, it is impossible to know whether the vehicles used for processing the creditor's investment in mortgage loans still exists and if so, its status.

8.16.     In most cases there have been multiple assignments or transmittals of documents or rights with regard to multiple parts of the securitization chain. These various stakes or revenue streams could include but not be limited to servicing rights, foreclosure rights, collection on the note, collection of federal bailout grants or loans, collection of payments from co-obligors added during the securitization of the Debtor's note, and collection of payments on credit default swaps which frequently are leveraged as much as thirty times the original value of the note(s) in the pool of assets subject to the CDS. Thus it is not known by the servicer or originator whether the Plaintiff/Debtor's note is or ever was in default – a fact that can only be known by the creditor and which is either not known or being withheld by the securitization parties in the case at bar. Based upon published reports, in my opinion, there is a very high probability that all or

*10*

part of the Debtor's note was paid in whole or in part by third parties, that different parties came to claim rights to enforce the mortgage and note and that the intention to split the note from the mortgage while heretofore unusual in the marketplace was commonplace in securitization of residential loans. Hence, it is my opinion that the holder of the note, either singular or plural, are not the same parties as those who purportedly hold the mortgage and that this was a result that was intended by the mortgage originator and the parties to the securitization chain, since it was a typical practice in the investment banking industry in their process of securitizing loans throughout the period of 2001-2009.

8.17.    The above facts result in a conflict of interest, claims and stakes by numerous parties contained within the securitization chain, some of which parties are known and some of which are not known to Plaintiff/Debtor and therefore not known to the undersigned declarant.

    8.17.1.    It also appears that the standard industry practice of creating a yield spread premium between the lender and originator was extended and expanded in the case of the securitization chain such that in this case, in my opinion, the Plaintiff/Debtor's loan was sold to the investors at a gross profit (i.e. a second yield spread premium) to the participants in the securitization chain of at least 35% of the total principal balance of the note. In my opinion, this disclosure does not appear on any of the closing documents identifying the parties participating in fee-splitting or yield spread premiums nor the amounts involved as required by the Truth in Lending Act and the Real

\( \)

Estate Settlement Procedures Act. Further, no information appears in Plaintiff/Debtor's closing documentation that would have caused him to inquire about such a premium, which exceeds any yield spread premium ever paid prior to the securitization of residential mortgages. In my opinion, it is equally probable that the investors were kept unaware that less than 2/3 of their investment was actually going to fund Plaintiff/Debtor's loan and other similarly situated. Based upon direct conversation with Plaintiff/Debtor, he also was unaware that such large profits or premiums were being generated by virtue of his identity and signature on the purported loan documents.

8.18.  Additional information submitted by licensed appraisers still in good standing with the licensing board along with public records documentation in other states indicates a pattern of behavior consistent with the subject "loan" Transaction, corroborates the existence of the second yield spread premium and shows that the appraisal on the property, upon which the property owner reasonably and legally relies as per the requirements of law and regulation, was artificially inflated per direct instructions from the purported "lender" or other firms in the securitization chain ultimately receiving their instructions from the investment banking firm that did the underwriting of the securities sold to the creditors/investors and which issued the instructions regarding the underwriting of the purported loans to homeowners including the subject transaction.

9.  My opinions are also based upon substantial knowledge, training, experience,

12

study and analysis of securities, securities regulation, securitization, derivatives and various precursor asset protection or bankruptcy remote schemes in commercial and real estate settings.

10.    My opinions are also based upon direct interaction via telephone, email or written correspondence with many intermediary conduits and some underwriters of the reissued securities to investors who bought mortgage-backed securities.

10. My opinions are based upon certain assumptions regarding securitization of the subject loan which can only be verified by review and analysis of the actual securitization documents, applicable credit default swaps or other insurance or hedge products, and audit, review and analysis of the effect, if any, of federal bailout money received by the creditor, (i.e., the party who actually advanced the funds from which the subject obligation was funded) or any parties who received such funding or money relating to or arising from the subject homeowner obligation created by the financial loan product sold to the homeowner in this instance.

11.    I express the following opinions that are offered within a reasonable degree of factual certainty and financial probability based upon filings with the Securities and Exchange Commission, prior knowledge of intermediary/conduit parties in the subject transactions, and the known participants in this loan and its securitization:

11.1.    The subject real estate and securities transactions were securitized, to wit: The subject homeowner and the unidentified Lender(s)/investor(s) entered into a transaction which was represented as a loan transaction whereby the investor(s) lent money to the homeowner and other homeowners similarly situated.

13

11.2. In terms of the real estate portion of the transaction, the homeowner was the borrower and the investor was the lender. The investor is still the lender if the investor has not sold, transferred or alienated the hybrid mortgage backed security and if the investor has not been directly or indirectly paid through credit default swaps, with or without subrogation, or paid through a federal program with or without subrogation. Since no such instruments appear on record, any right of subrogation would appear to be equitable. Thus for purposes of this declaration, the unknown and undisclosed investor(s) constitute the only Lender presumed to exist until the undersigned is presented with contrary evidence admissible in a court of law.

11.3. The only parties that can claim to be creditors (or a holder in due course of the note) are those who would suffer a monetary or pecuniary loss resulting from non-payment of the obligation either because they advanced the actual funds from which the Bailey Loan Product was funded or because they would have paid value prior to default or notice of default. These parties fall within one or more of the following classifications:

11.3.1. Investors who purchased asset backed securities in which ownership of the LOANS was described with sufficient specificity as to at least express the intent to convey ownership of the obligation as evidenced by the promissory note and an interest in real property consisting of a security interest held by an entity that was described as the beneficiary of a Trust created by an instrument entitled Deed of Trust;

14

THEREFORE I CONCLUDE THAT THE CREDITORS ARE THE UNIDENTIFIED INVESTORS AND ALL OTHER PARTIES ARE INTERMEDIARY OR REPRESENTATIVE OR DISINTERESTED.

11.4.    Title is affected by the following:

11.4.1.    Insurers that paid some party on behalf of said investors;

11.4.2.    counter-parties on credit default swaps;

11.4.3.    conveyances or constructive trusts arising by operation of law through cross collateralization and over-collateralization within the aggregate asset pools or later within the Special Purpose Vehicle tranches ("tranches" is an industry term of art referring to the types of division within a Special Purpose Vehicle);

11.4.4.    the United States Treasury Department through the Troubled Assets Relief Program in which approximately $700 billion has been authorized and paid to purchase or pay the obligation on "troubled" (non-performing) assets of the LOANS. The subject "loan" is part of the class of assets targeted by TARP;

11.4.5.    the United States Federal Reserve, which has extended credit on said troubled assets and has exercised options to purchase said troubled assets;

11.4.6.    any other party that has traded in mortgage backed securities from the aggregated pools or securitized tranches containing interests in the LOANS.

15

12.     However, it is unlikely that any holder in due course exists because in the practice of securitization as it was followed universally within the investment banking community, the recorded encumbrance was never effectively or constructively transferred because it was never executed in recordable form nor was an effort made to create such a document by the parties to the instant case until they decided to issue a notice of delinquency, notice of default, notice of sale, and Petition for Unlawful Retainer and Writ of Possession.

12.1.    Hence any transfer or purported transfer of the note was not accompanied by the encumbrance being incident to said transfer because applicable recording statutes require an interest or change of interest in real property to be recorded. Hence the loan product sold to the subject homeowner included a promissory note that was evidence of a real obligation that arose when the transaction was funded but lost its negotiability, thus barring anyone from claiming holder in due course status.

12.1.1.    The negotiability of the note is negatively affected by (1) the splitting of the note and mortgage as described above, (2) by the addition of terms, conditions, third party obligors and undisclosed profits, fees, kickbacks all contrary to existing federal and state applicable statutes and common law and (3) knowledge of title and chain of title defects in the ownership of the note, beneficial interest in the encumbrance, and position as obligee on the obligation originally undertaken by the subject homeowner. .

*16*

12.2.    None of the known participants in the subject securitization chain (including but not limited to Defendants herein) falls within any of the classifications of "Lenders" or holders in due course on the subject financial products sold to the subject homeowner as LOANS. A Lender or Creditor is a party who advances or creates money for the benefit of another with the expectation of receiving it back, usually with a profit denominated as "interest." The investor fits this definition. All other parties including the putative foreclosing parties in the case at bar, fall into the class of intermediaries or conduits, playing the role of payment mechanism or document repository or record keeper.

12.3.    None of the known securitization participants has suffered any financial loss relating to the LOANS, nor are they threatened with any future loss if foreclosure remains enjoined by the automatic stay.

12.4.    None of the known securitization participants has ever been the real party in interest as a lender or financial institution underwriting a loan while funding same with respect to the LOANS.

12.5.    None of the known securitization participants will suffer any monetary loss through non-performance of the LOAN.

12.6.    All of the known securitization participants received fees and profits relating to the LOANS.

12.7.    The existence and identity of the real parties in interest was withheld from the homeowner in the closing and servicing of the LOANS, and since.

13.    Several transactions have purportedly taken place regarding the Bailey "Loan."

17

None of them appear to have actually conveyed anything since all conveyance documentation was effective simultaneously or contemporaneously with closing of the subject transactions. The investors are still the source of funding, the securities were sold to the investors with conveyance of ownership of the "Loan" product purchased by Bailey, and the transfers claimed by "successor" parties all occurred AFTER the conveyance was effective in favor of the investors. Since the loans were conveyed before the transfers for good consideration, I conclude that none of the other parties posses any title, color of title, or claim under the note and mortgage executed by Bailey.

14.    Further, the award of title to any of these other parties would be in derogation of the title and claims of the investors who are the only and actual sources of funding/consideration. The interest in the obligation, the note as evidence of the obligation, and the security interest for the obligation were purportedly transferred multiple times without recording the change in ownership of an interest in real property in the appropriate county records. In my opinion, the "Lender" in securitized loans is only a nominee for an undisclosed principal. The transaction with the homeowner is subject to a pre-existing contractual relationship wherein the investors advanced the cash for the loan and profits, fees, expenses, rebates, and kickbacks. This is known to many of the known and unknown securitization participants, inasmuch as they have been the recipients of memoranda from legal counsel and advisers (not protected by attorney client privilege or the attorney work product privilege) in which they have been informed that any nominee that does not advance

13

cash for funding the loan and does not receive any payments on the obligation in particular allows multiple parties to make claims on the same property from the same borrower, using the same note and the same security interest.

14.1. The intended monetary effect of the use of such a nominee was to provide obfuscation of profits and fees that were disclosed neither to the investor who put up the money nor to the borrower in this LOAN. In the case at bar, it is my opinion based upon a reasonable degree of certainty (beyond more likely than not) that the total fees and profits generated were actually in excess of the principal stated on the note --- which is to say that investors unknowingly placed money at risk the amount of which vastly exceeded the funding on the loan to the borrower.

14.1.1. The only way this could be accomplished was by preventing both the borrower and the investor from accessing the true information, which is why the industry practice of nominees like the private MERS system were created. Even where MERS is not specifically named in the originating documents presented to the homeowner at the "closing" it was industry practice from 2001-2008 to utilize MERS "services". Therefore it is possible and even probable that the data from the closing was entered into the MERS electronic registry and that an assignment was executed to MERS purportedly giving MERS some power over the obligation, the note and/or the encumbrance. As a general rule in securitized transactions and especially where MERS is named as nominee, documents of transfer

19

(assignments, endorsements, etc.) are created and executed contemporaneously with the notice of default thus selecting a participant in the securitization chain to be the party who initiates collection and foreclosure.

15.     The notice of default in the case at bar was in all probability substantially before any fabrication or creation of documents of transfer and before any such documents were recorded. Further it does not appear that any such documents were executed in recordable form under the laws of the State and in accordance with the local administrative rules governing recordation of instruments that purport to show an interest in real estate. Hence it is my opinion, as above, that the existence of any document of transfer in this case is inconsistent with the authority – apparent or actual --- to execute same without some additional documentation establishing a foundation for the document of transfer (assignment, endorsement etc.). No such document having been produced the inescapable conclusion is that no authority exists and that if permitted to move forward with a foreclosure or foreclosure sale, a title defect would be created beyond the current cloud on title, thus rendering the title permanently unmarketable without the entry of a court order from a court of competent jurisdiction declaring the rights of all stakeholders --- potential and otherwise. This opinion should not be construed to deny the existence or validity of the note, mortgage or underlying obligation. It is meant solely to convey the opinion that none of the existing parties known to the homeowner have any authority, apparent or otherwise, to declare the obligation in default or to pursue collection on

20

the only potential party to a foreclosure wherein the purported creditor alleges financial injury and therefore a right to collect the obligation, enforce the note or enforce the security instrument is either a party who has actually advanced cash and stands to lose money or an authorized representative who can disclose the principal, provide proof of service or notice, and thus show such authority.

17.     In my opinion, as above, and with a reasonable degree of factual and legal certainty, the disclosed principals in the securitization chain are not the Lender(s) nor are they agents for the Lender(s). In my opinion, as stated in this paragraph, these parties are interlopers or impostors whose design is to take title to property they have no right to claim, and to enforce a note which is evidence of an obligation that is not owed to them but rather to another. The details of this information, whether the special purpose vehicle still exists, whether the investor(s) has been paid in full through federal or insurance payment, are known only to these securitization participants.

18.     In my opinion the attorneys for the known securitization participants do not have any authority to represent the Creditors, and could not represent them due to the obvious conflict of interest, to wit: the investor(s) upon learning that a substantial amount of their advance of cash was pocketed by the intermediaries and now is left with a mortgage whose nominal value is far below what was paid, and whose fair market value is far below the nominal value, would have potential substantial claims against the securitization participants for fraud, breach of contract, and other claims.

19.     I have also reviewed, for the past 40 years, published Financial Accounting

22

Standards obviously intended for auditors involved in auditing and rendering opinions on the financial statements of entities involved in securitization, securities issuance and securities sale and trading. If the known participants in the securitization scheme followed the rules, they did not post the instant transaction as a loan receivable. The transaction most likely was posted on their ledgers as fee income or profit, which was later reported on their income statement in combination with all other such transactions. These rules explain how and why the transactions were posted on or off the books of the larger originating entity. These entries adopted by said companies constitute admissions that the transaction was not considered a loan receivable on its balance sheet (or on the ledgers used to prepare the balance sheet) but rather shown on the income statement as a fee for service as a conduit. These admissions in my opinion are fatal to any assertion by any such party currently seeking to enforce mortgages in their own name on their own behalf, including but not limited to the securitization participant in this case.

20.     In my opinion, with a high degree of certainty, the Plaintiff/Debtor's title was and is subject to a cloud on title, a claim of unmarketable title and possibly a title defect that cannot be cured without court order as a result of the manner in which Plaintiff/Debtor's loan was securitized. In all cases reviewed by me, which include more than fifty securitization chains, the Prospectus and other published documents clearly express that a securitized mortgage is treated sometimes as being secured by real estate, and sometimes as not being secured by real estate, depending on the context and purpose of the accounting. The naming of a party other than the Lender

23

as beneficiary under the Mortgage Deed as distinct from a third party named as Payee on the promissory note and the same or other third party named as beneficiary under the policy of title insurance demonstrates an intent or presumption or reasonable conclusion that there was intent by some or all of the parties at various times in the steps of the securitization process to separate the Note from the Deed of Trust, thus creating a cloud on title for both the owner of the property and any party seeking to express or claim an interest in the real property by virtue of the encumbrance.

FURTHER, AFFIANT SAYETH NAUGHT.

Signed on January 17, 2010

/s/ Neil Franklin Garfield, Esq.

_____

**ANDREW C. BAILEY**
2500 N. Page Springs Rd
Cornville, AZ 86325
928 634-4335
*Debtor/Plaintiff in Pro Per*

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>ANDREW C. BAILEY<br>Debtor/Plaintiff<br><br>Vs<br><br>WELLS FARGO BANK, NA<br>Movant/Defendant | **Chapter 11**<br>**Case #: 2:09-bk-06979-PHX-RTBP**<br>(Associated Case # 2:09-ap-01729-RTBP)<br><br>**DEBTOR'S FIRST SET OF**<br>**INTERROGATORIES AND FIRST**<br>**REQUEST FOR PRODUCTION OF**<br>**DOCUMENTS**<br>Subject Property:<br>Raw Land at 2620 N. Page Springs Rd,<br>Cornville, AZ 86325 |

## DEBTOR'S FIRST SET OF INTERROGATORIES

## AND FIRST REQUEST FOR

## PRODUCTION OF DOCUMENTS

Pursuant to Rule 33 and Rule 34 of the Federal Rules of Civil Procedure, Debtor/Plaintiff requests that Movant/Defendant answers the following Interrogatories and produces documents in accordance with the following Request for Production of Documents.

Exhibit D

## DEFINITIONS

1. WELLS FARGO BANK NA includes any and all persons and entities presently or formerly acting for or in concert with WELLS FARGO BANK NA.

2. "Document" includes each record held in WELLS FARGO BANK NA's possession or generated by WELLS FARGO BANK NA.

3. The word "document(s)" includes all "writings," "recordings," and "photographs," as those terms are defined in Rule 1001 of the Federal Rules of Evidence, and should be construed in the broadest sense permissible. Accordingly, "document(s)" includes, but is not limited to, all written, printed, recorded or graphic matter, photographic matter, sound reproductions, or other retrievable data (whether recorded, taped, or coded electrostatically, electromagnetically, optically or otherwise on hard drive, diskette, compact disk, primary or backup tape, audio tape or video tape) from whatever source derived and however and by whomever prepared, produced, reproduced, disseminated or made. Without limiting the generality of the foregoing, "document(s)" includes the original and any non-identical copy and also every draft and proposed draft of all correspondence, internal memoranda, notes of meetings, telegrams, telexes, facsimiles, electronic mail, reports, transcripts or notes of telephone conversations, diaries, notebooks, minutes, notes, tests, reports, analyses, studies, testimony, speeches, worksheets, maps, charts, diagrams, computer printouts, and any other writings or documentary materials of any nature whatsoever, whether or not divulged to other parties, together with any attachments thereto and enclosures therewith. In addition, the word "Document(s)" encompasses all forms and manifestations of electronically or optically coded, stored, and/or retrievable information, including but not limited to "e-mail," "voice mail," digital images and graphics, digital or analog audiotapes and files, and digital or analog videotapes and files.

4. The word "person(s)" includes not only natural persons, but also firms, partnerships,

associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, trusts, groups, and organizations; federal, state, or local governments or government agencies, offices, bureaus, departments, or entities; other legal, business, or government entities; and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof or any combination thereof.

5. As used herein, any reference to any "person" includes the present and former officers, executives, partners, directors, trustees, employees, attorneys, agents, representatives, and all other persons acting or purporting to act on behalf of the person and also its subsidiaries, affiliates, divisions, and predecessors and successors in interest.

6. The words "you," "your", "defendants" or "movants" refer to defendants, defendant-intervenors, movants, and their agents, representatives, attorneys, experts, and all other persons acting or purporting to act on behalf of Movant/Defendant.

7. The singular of each word shall be construed to include its plural and vice versa, and the root word and all derivations (*i.e.*, "ing," "ed," etc.) shall be construed to include each other.

8. The words "and" as well as "or" shall be construed both conjunctively as well as disjunctively.

9. The word "each" shall be construed to include "every" and vice versa.

10. The word "any" shall be construed to include "all" and vice versa.

11. The present tense shall be construed to include the past tense and vice versa.

12. The masculine shall be construed to include the feminine and vice versa.

13. The words "knowledge," "information," "possession," "custody," and "control" of a person shall be construed to include such person's agents, representatives, and attorneys.

14. The word "including" shall have its ordinary meaning and shall mean "including but not limited to" and shall not indicate limitation to the examples or items mentioned.

15. The phrase "reflect, refer, or relate to" means reflecting, referring, relating to,

regarding, discussing, concerning, constituting, mentioning, pertaining to, alluding to, or associated with.

16. The words "to present" mean to the date on which you respond to these interrogatories and requests.

## INSTRUCTIONS

1. Unless otherwise specified, if your response in regard to a portion of the time period addressed in any interrogatory differs from your response in regard to another portion of such period, provide a response for each such portion and indicate the period of time to which each response relates.

2. Deem any reference to a non-natural person to include the legal predecessors of such non-natural person.

3. When an interrogatory asks you to "describe" or "identify" a document, provide the following information with respect to each such document:

a. The date appearing on such document; or if it has no date, so state and give the date or approximate date such document was prepared, produced, created, or came into being;

b. Any identifying or descriptive code number, file number, title or label of such document;

c. The general nature or description of such document;

d. The name of the person(s) who signed, authored, produced or created such document;

e. The name of the person(s) who prepared such document if different from the name provided pursuant to subpart (d) of this instruction;

f. The name of the person(s) to whom such document was addressed and the name of each such person other than the addressee to whom such document, or copy or reproduction thereof, was given or sent;

g. The name of the person or entity having present possession, custody and/or control of such document;

h. The present location of such document;

i. If such document was, but is no longer in your possession or control, state what disposition was made of such document, the reason for such disposition, and the date thereof.

j. Whether or not any draft, copy, or reproduction of such document contains any script, notation, change, addendum, or the like, not appearing on such document itself, and if so, the answer shall give the description and identification of each such draft, copy or reproduction in accordance with the above subparts (a) through (i).

4. The above information shall be given in sufficient detail to enable any person or party to whom a subpoena or request for production is directed to identify the documents sought to be produced and to enable counsel to determine whether such document, when produced, is in fact the document so described and identified.

5. Notwithstanding any other instruction in this First Set of Interrogatories that is or may be to the contrary, if a document has already been produced by you to the Plaintiff, such document may be identified by specifying the Bates numbers for all pages of such document.

6. A request that you identify a document is not limited to documents within your possession, and such requests shall extend to all documents under your control.

7. When an interrogatory asks you to "identify" a person, the answer shall contain the following information with respect to each such person:

a. The full name, current or last known business and residence addresses, and business and residence phone numbers of such person;

b. The name and address of the agency, employer or entity at which such person worked and/or to which such person reported;

c. The title(s) and related periods of service for such person with each such agency,

employer or entity.

8. When an interrogatory calls for the "description" or "identity" of any "document" you contend to be subject to a privilege against disclosure in response to these interrogatories, provide with respect to each such document or communication the following:

a. The nature of the document you contend is privileged (*e.g.*, letter, memorandum, chart, picture, report, etc.);

b. The number of pages comprising the document and a description of any identifying marks or designations (*e.g.* Bates numbers) if any, on the document;

c. The date of the document which you contend is privileged;

d. The name(s) of the author(s) and of any recipient(s) of the document;

e. The name and address of any person who is not included in your response to subpart (d) with respect to such document and who has access to or has seen, read, or heard any portion of the material in the document that you contend to be privileged; and

f. The nature of the privilege asserted.

9. In answering each of these interrogatories, furnish all information available to you that is relevant or that might lead to the discovery of relevant evidence, including information in the possession of your attorneys, or their investigators, and all persons acting on your behalf, including but not limited to your employees, agents, officers, or representatives. If you are unable to answer these interrogatories in full after exercising due diligence to supply a complete answer, so state and answer to the extent possible. Specify the reasons for your inability to answer and state whatever information or knowledge you have concerning the unanswered portions.

10. For each interrogatory or part of an interrogatory that you refuse to answer on grounds of burdensomeness, explain in as much detail as possible the basis for your refusal.

11. These interrogatories are deemed to be continuing; as such, you are requested to file and

serve by way of supplemental answers thereto such additional information as may be required to complete your answers to these interrogatories.

**INTERROGATORIES**

Where applicable, with respect to your answer to each of these interrogatories, please:

A. identify each person on whose testimony you will or may rely in support of your answer;

B. identify each document on which you will or may rely in support of your answer.

1. State the name, job title and business address of each person providing information in response to these discovery requests:

2. State the type of business organization WELLS FARGO BANK NA is, and name each State of the Union in which WELLS FARGO BANK NA is chartered or registered:

1   3. State the name, job title, and business address of each person who has first-hand
2      personal knowledge of the time and circumstances under which the promissory note
3      obligating Andrew C. Bailey and/or alienable in this instant case was created, sold,
       transferred and/or assigned for value:
4
5
6
7
8
9
10
11
12
13
14
15
16
17  4. State the name and contact information of the creditor in the instant case.
18     (NOTE: The creditor is the person who actually provided the money for the Debtor's
       table-funded loan in expectation of payment, and who stands to lose money in the
       event of default.)
19
20
21
22
23
24
25

5. State the names and contact information of all persons or entities, in order of assignment, who at any time were constructive holders or holders in due course of the promissory note obligating Andrew C. Bailey and/or alienable in this instant case:

6. State the name and contact information of the current beneficiary under the promissory note obligating Andrew C. Bailey and/or alienable in this instant case:

7. If the name of the current beneficiary under the promissory note obligating Andrew C. Bailey and/or alienable in this instant case in Item (6) above is different from your name (WELLS FARGO BANK NA), explain why:

8. Explain why the alleged copy of the promissory note submitted as Exhibit "A" attached to Movant's Motion for Lift from Stay includes no allonge or endorsement showing any assignment of the note to WELLS FARGO BANK NA:

9. If WELLS FARGO BANK NA did not keep or cannot produce a copy of an allonge or other paper showing assignment to WELLS FARGO BANK NA of the promissory note obligating Andrew C. Bailey and/or alienable in this instant case, explain why.

10.    Identify the name, address and telephone number of each person or entity likely to have discoverable information relevant to the foregoing or that you may use to support your action.

## REQUEST FOR PRODUCTION OF DOCUMENTS

Debtor/Plaintiff hereby requests that Movant/Defendant WELLS FARGO BANK NA produce the following documents for inspection and copying within 30 days of service of this request, or any earlier date on which the parties agree, subject to the foregoing Definitions and Instructions set forth above, at the offices of the Yavapai County Recorder, 6th Street, Cottonwood, AZ or at another location agreeable to the parties hereto.

1. Produce the <u>original</u> promissory note signed by Andrew C. Bailey and/or alienable in this instant case. If none, state "none."

2. Produce all documents identified by you in response to each interrogatory set forth above. If none, state "none".

3. Produce all documents associated with WELLS FARGO BANK NA's transfer and assignment of all beneficial interest in the promissory note alienable in this instant case to any other person. If none, state "none".

4. Produce a copy of the allonge or endorsement attached to the promissory note obligating Andrew C. Bailey and/or alienable in this instant case showing an assignment of the promissory note from any such other person back to WELLS FARGO BANK NA. If none, state "none."

5. Produce any and all Pooling and Servicing Agreement or other contractual agreement or memo involved in the "securitization" of the subject promissory note. If none, state "none".

6. Produce the account and general ledger statement of each transaction WELLS FARGO BANK NA alleges Andrew C. Bailey has made with WELLS FARGO BANK NA with respect to the promissory note alienable in this instant case, showing all receipts and disbursements. If none, state "none".

7. Produce all bills of sale and allonges and agreements illustrating where the promissory note alienable in this instant case was sold or assigned for value, from inception to the present. If none, state "none".

8. Produce all insurance claim information and credit default claim or settlement or payment records relative to any alleged default under the promissory note alienable in this instant case. If none, state "none".

9. Produce all information pertaining to Federal TARP or other bailout settlements or payments relative to any alleged default under the promissory note alienable in this instant case. If none, state "none".

10. Produce all contracts, agreements, and/or memos illustrating that law firm Jaberg & Wilk, PC has authority to represent WELLS FARGO BANK NA in this instant case. If none, state "none".

11. Produce all contracts, agreements, and/or memos illustrating that WELLS FARGO BANK NA or its attorney, law firm Jaberg & Wilk, PC has authority to represent the creditor in this instant case. If none, state "none".

12. Produce all documents or data compilations that are in your possession, custody or control that you may use in support of your action.

Respectfully submitted this 11th day of January, 2010

Signed _____

Andrew C. Bailey, *Debtor in Pro Per*

**CERTIFICATE OF SERVICE**

I, Andrew C. Bailey, certify that on the 11th day of January, 2010, a true and correct copy of Debtor/Plaintiff's First Set of Interrogatories and First Request for Production of Documents was served upon the attorney for Movant/Defendant by both certified mail and facsimile transmission to:

Ronald Horwitz, Esq
Jaberg & Wilk, PC
3200 N. Central Avenue, suite 2000
Phoenix AZ 85012
(Attorney for Wells Fargo Bank NA)


Signed this 11th day of January, 2010.


Andrew C. Bailey, *Debtor/Plaintiff in Pro Per*